1
2
3
4
5
6
7        UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF WASHINGTON
8                  AT SEATTLE
9

10   In the Matter Of:                    IN ADMIRALTY

11   THE COMPLAINT OF DAVID BELL          CASE NO. C12-1126JLR
     AND GERRI JACKSON-BELL,
12                                        ORDER GRANTING IN PART
                    Petitioners           MOTION FOR SUMMARY
13                                        JUDGMENT

14        Before the court are cross-motions for summary judgment brought by Petitioners

15   David Bell and Gerri Jackson-Bell ("the Bells") (Bell MSJ (Dkt. # 28)) and Claimants the

16   Port of Edmonds and Enduris (Port MSJ (Dkt. # 34)) (collectively referred to along with

17   claimant Ace Insurance Company as "Claimants"). This is an admiralty case. The Bells'

18   private boat, the SEA FOR TWO, caught fire on New Year's Eve of 2011. It was docked

19   at the Port of Edmonds. The parties dispute whether the Bells should be held liable for

20   damages that resulted from the fire. (*See* Compl. (Dkt. # 1).) Claimants argue that the

21   Bells should be liable because they were negligent and because their boat was not

22   seaworthy. (*See* Port MSJ; Ace Resp. (Dkt. # 40).) In response, the Bells argue that they

are permitted to limit their liability under the Shipowners' Limitation of Liability Act, 46 U.S.C. § 30505, an Act of Congress passed in 1851 ("the Act"). (*See* Bell MSJ.) Both sides ask the court for summary judgment. The court has examined the record, the submissions of the parties, and the relevant law. Considering itself fully advised,[1] the court GRANTS IN PART[2] and DENIES IN PART the Bells' motion and DENIES the Port's motion.

## I. INTRODUCTION

This is a "limitation of liability" action brought pursuant to a law passed over 160 years ago: the Shipowners' Limitation of Liability Act of 1851, 46 U.S.C. § 30505. (*See* Compl.) That act, which is little-used today,[3] has been described as "a relic of the clipper ship era in which it was launched," Craig H. Allen, *The Future of Maritime Law in the*

---

[1] No party has requested oral argument pursuant to the Local Rules of the Western District of Washington. *See* Local Rule W.D. Wash. CR 7(b)(4). The general rule is that the court may not deny a request for oral argument made by a party opposing a motion for summary judgment unless the motion is denied. *Dredge Corp. v. Penny*, 338 F.2d 456, 462 (9th Cir. 1964). Federal Rule of Civil Procedure 56, however, does not require a hearing where the opposing party does not request it. *See, e.g.*, *Demarest v. United States*, 718 F.2d 964, 968 (9th Cir. 1983). The court therefore determines that these motions are appropriate for decision without oral argument.

[2] Two claims remain after this motion for summary judgment. First, Claimants have asserted a post-fire contractual claim related to the salvage and storage of the SEA FOR TWO. (*See* Answer (Dkt. # 12) at 3; Port MSJ at 18.) The Bells do not address this claim in their filings, other than to acknowledge that the issue remains even if summary judgment is granted on all other issues. (Bell Resp. (Dkt. # 42) at 30.) Second, as discussed below, the court denies summary judgment with respect to one of Claimants' theories of negligence.

[3] For example, between 1953 and 1996, only 166 limitation of liability cases were pursued to judgment in federal courts—an average of less than four per year. Craig H. Allen, *The Future of Maritime Law in the Federal Courts: A Faculty Colloquium*, 31 J. MAR. L. & COM. 263, 263 (2000) (citing The MLA Report, MLA Doc. No. 729 (May 2, 1997), at 10487, 10527-36).

*Federal Courts: A Faculty Colloquium*, 31 J. MAR. L. & COM. 263, 263 (2000), and "an 'anachronism, a principle which should be relegated to the era of wooden hulls,'" Mark A. White, *The 1851 Shipowners' Limitation of Liability Act: Should the Courts Deliver the Final Blow?*, 24 N. ILL. U. L. REV. 821 (2004) (quoting Carter T. Gunn, *Limitation of Liability: United States and Convention Jurisdictions*, 8 Mar. 29, 29 (1983)). Despite its old age, the Act is still the law of the land. *See, e.g.*, *In re Mission Bay Jet Sports, LLC*, 570 F.3d 1124 (9th Cir. 2009) (applying the Act in 2009); *see generally* Allen, *The Future of Maritime Law*, 31 J. MAR. L. & COM. 263.

The Act's provisions are straightforward. The Act places a cap on the liability of a vessel owner for damages caused by the vessel—specifically, the vessel owner is not liable for amounts greater than the value of the vessel itself plus its freight:

> **(a)    In General.**—Except as provided in section 30506 of this title, the liability of the owner of a vessel for any claim, debt, or liability described in subsection (b) shall not exceed the value of the vessel and pending freight.

46 U.S.C. § 30505(a). The act covers, and caps liability for, a wide range of damages as long as those damages are "done, occasioned, or incurred, without the privity or knowledge of the owner." *See* 46 U.S.C. § 30505(b). The general idea of the liability cap is to encourage investment in maritime ventures by limiting the possibility that a single shipwreck or other marine catastrophe will drive an investor into financial ruin. White, *The 1851 Shipowners' Limitation of Liability Act*, 24 N. ILL. U. L. REV. at 824.

The Act has a long and colorful history that sheds a helpful light on its purpose and operation today. *See generally id.* The idea of limited liability for vessel owners

dates back many years; scholars speculate that it was part of Roman law and was perhaps codified in the Amalphitan Tablets during the eleventh century. *See id.* (citing James J. Donovan, *The Origins and Development of Limitation of Shipowners' Liability*, 53 TUL. L. REV. 999, 1000-01 (1979); Dennis J. Stone, *The Limitation of Liability Act: Time to Abandon Ship?*, 32 J. MAR. L. & COM. 317, 318-19 (2001)). The concept spread throughout Europe as continental commerce developed and, by the Middle Ages, was embedded in the laws of most shipping nations of the Mediterranean. *Id.* The concept was adopted in Germany by "the Hanseatic Ordinances of 1614 and 1644," and France by the Louis XIV in the "French Marine Ordinance of 1681," both of which, like the Act, limit the liability of a vessel owner to the value of the ship. *Id.* at 825 (citing 2 PETERS, ADMIRALTY DECISIONS IN THE DISTRICT COURT OF THE UNITED STATES FOR THE PENNSYLVANIA DISTRICT (1807)). The English caught up with continental Europe in 1734, codifying limited liability after public outrage over a case in which a ship owner was held liable for the theft of a huge amount of bullion by the ship's captain. *Id.* at 825-26 (citing 95 Eng. Rep. 53 (K.B. 1734); LORD CHARLES TENTERDEN, A TREATISE OF THE LAW RELATIVE TO LAW OF MERCHANT SHIPS AND SEAMAN, 163 (1901); *The Main v. Williams*, 152 U.S. 122, 128 (1894)). The English law was different from many in continental Europe in that, like the Act, it conditioned limited liability on the vessel owner's lack of privity or knowledge. *See id.* at 826.

The limited liability concept came to America in 1851, its passage sparked by several notorious maritime tragedies. *See id.* at 826-27. American shipowners were already feeling disadvantaged relative to their European competitors, and the issue came

to a head after a steamboat called the Lexington sank in the Long Island Sound, its cargo

of cotton bales catching fire after being stowed too close to the ship's chimney. *Id.* at

827-28 (citing *The Lexington*, 47 U.S. (6 How.) 344 (1848)). Shipowners were outraged

when the Lexington's owner was held liable for the deaths of 146 passengers in addition

to the loss of a chest filled with gold and silver coins worth $18,000.00.[4] *Id.* Outrage

also ensued after the case of The Henry Clay, in which a shipowner was held liable for a

fire that occurred at a wharf despite no proof of actual fault or negligence. *Id.* at 828

(citing *Wright v. Norwich & N.Y. Transp. Co.*, 30 F. Cas. 685, 687 (C.C.D. Conn. 1870)).

In response to this outrage, Congress passed the Act in 1851 "for the express purpose of

aiding the fledgling American merchant marine by attempting to put it on par with its

British competition, whose shipping had been protected by limitation laws for over a

century." *Id.* The Act passed with no debate in the House of Representatives and less

than a day of debate in the Senate despite concerns about its "poor draftsmanship" that in

subsequent years have proven to be prescient. *Id.* at 829-30 (citing CONG. GLOBE, 31st

Cong., 2d Sess. 334-35 (1851)).

Little about the Act has changed since its passage, either by judicial interpretation

or legislative amendment. The Act languished in disuse during the Civil War and

Reconstruction eras, and was not graced with its first interpretation by the Supreme Court

until 1866. *See id.* at 831-32 (citing Joseph C. Sweeney, *Limitation of Shipowner*

*Liability: Its American Roots and Some Problems*, 32 J. MAR. L. & COM. 241, 283

---

[4] Roughly $471,000.00 in today's dollars.

(2001)).  In that first case, which again involved a ship sinking in the Long Island Sound (this time after a collision with another ship), the Supreme Court held that a vessel owner's liability is limited to the value of the ship after, not before, the damage-causing incident.  *See id.* at 832 (citing *Norwich & N.Y. Transp. Co. v. Wright (The City of Norwich)*, 80 U.S. (13 Wall.) 104 (1872)).  Thus, if the ship sinks and is a total loss, liability is capped at zero.  *See id.*  This concept is illustrated in dramatic fashion by the case of the Torrey Canyon, in which an oil tanker carrying 119,328 tons of crude oil became stranded off the Southwest coast of England, leaking vast amounts of oil into the English Channel.  *Id.* at 832-33.  (citing *In re Barracuda Tanker Corp. (The Torrey Canyon)*, 281 F. Supp. 228 (S.D.N.Y. 1968)).  Eventually, the Royal Air Force was called in to bomb and sink the ship.  *Id.* at 833.  The ship's owner, Barracuda Tanker Corp., used the Act to successfully limit its liability to $50.00—the value of a single lifeboat salvaged from the wreck.  *Id.*  This occurred in 1968, and the law applied in that case is the same law that would be applied today.  On the legislative side, amendments have excluded claims for seaman's wages from the liability cap and provided for expanded liability if an accident results in injury or death.  *Id.* at 833-35 (citing Act of June 26, 1884, ch. 121, 23 Stat. 53).  The latter amendment came about after the passenger cruise-liner Morro Castle burned within sight of the New Jersey coastline, taking 134 lives but only resulting in shipowner liability of $20,000.00.[5]  *Id.* at 834 (citing Alan F. Schoedel, MARITIME LIABILITY:  ISSUES FOR THE NEW CONGRESS, 11

---

[5] Roughly $335,000.00 in today's dollars.

Mar. 105, 106 (1986); Morro Castle (Settlement) 1939 A.M.C. 895 (S.D.N.Y. 1939)).

Apart from these amendments, the law operates today much as it did when it was passed

in 1851. *Id.* at 835; *see generally* Allen, *The Future of Maritime Law in the Federal

Courts*, 31 J. MAR. L. & COM. 263 (describing the contours of the doctrine today).

With this long history firmly in mind, the court turns to the facts of this case,

which involve a maritime tragedy of an entirely different scope and scale than many of

those described above.

## II.    FACTUAL BACKGROUND

On New Year's Eve of 2011, in the early hours of the morning, the Bells' 45-foot

Bayliner motor cruiser caught fire. (Bell Decl. (Dkt. # 31) ¶ 6.)  The Bells had owned the

vessel, called the SEA FOR TWO,[6] since 1997.  (*Id.* ¶ 2.)  The Bells kept the SEA FOR

TWO moored at the Port of Edmonds, and had done so for over twenty years.  (*Id.*)  They

live less than two miles from the Port.  (*Id.*)  On December 31, 2011, the vessel was

moored at its usual slip at the Port of Edmonds when it suddenly "burst into flames" in

the wee hours of the morning.  (Compl. at 2.)  The fire consumed the SEA FOR TWO,

and eventually spread to the neighboring vessel, the GREAT S'CAPE.  (*Id.*)  Both the

SEA FOR TWO and the GREAT S'CAPE were completely destroyed, and as many as 22

other vessels suffered heat and smoke damage.  (*Id.*)  The fire was not detected until an

employee from neighboring restaurant Anthony's Homeport saw it and called 9-1-1

---

[6] When the Bells purchased the boat, it was named GREAT SCOTT.  (*See* Bell MSJ at 1.)  The court declines to take judicial notice of the popularly-held belief that it is bad luck to change a boat's name.  *See, e.g.*, *Mullane v. Chambers*, 206 F. Supp. 2d 105, 107 (D. Mass. 2002) ("As any sailor will tell you, it is bad luck to change the name of a boat . . . .").

around 3:53 AM.  (Conklin Decl. (Dkt. # 37) ¶ 5; Farnam Decl. (Dkt. # 41) Ex. A at 4.)

After the fire, the SEA FOR TWO sank and now has no value.  (Compl. at 2, 3.)

There were no unusual circumstances surrounding the fire.  Before the fire broke

out, it was a calm night with "no unusual activity."  (Conklin Decl. ¶ 2.)  There was a

security guard on duty.  (*Id.*)  The weather was cold with a moderate wind, and the

breakwater was calm.  (*Id.*)  Mr. Bell had visited the boat the previous day for about 1.5

hours.  (Bell Decl. ¶ 5.)  He arrived on the boat at 11:30 AM, emptied the de-humidifier

into the galley sink, turned on his computer, and started downloading updates to the

computer's software.  (*Id.*)  He started the vessel's generator, but it "did not sound right,"

so he turned it off and called a marine contractor to set up an appointment to fix it.  (*Id.*)

He performed several other acts of routine maintenance on the boat and checked to make

sure everything was as it should be.  (*Id.*)  It was.  (*Id.*)  He left around 1:00 PM, leaving

on a fluorescent lamp, the dehumidifier, the refrigerator, and two heaters as per his

ordinary practice.  (*Id.*)  Nothing seemed amiss.  (*See id.*)  At the time of the fire, the SEA

FOR TWO was locked and covered with a protective canvass.  (Derrig Decl. (Dkt. # 35)

Ex. A at 9-10.)

The cause of the fire is unknown.  Three different investigators inspected the fire,

and all of them reached this same conclusion.  Investigator Paul Way concluded that "it is

not possible to offer an opinion as to the cause of the fire on the SEA FOR TWO to a

reasonable probability and none of the examining experts have done so."  (2d Way Decl.

(Dkt. # 46) ¶ 5.)  Mr. Way determined that the fire most likely originated in the "forward

V-berth" of the SEA FOR TWO.  (*Id.* ¶ 4.)  He identified two possible causes of the fire:

the overhead lighting circuit in the V-berth and the heater in the V-berth. A second investigator, Michael Fitz, concluded that "[b]ecause there are three possible causes in the area of origin, the cause of the fire is undetermined at this time." (Farnam Decl. Ex. A ¶ 12.) Like Mr. Way, Mr. Fitz determined that the fire originated in the V-berth of the SEA FOR TWO. (*Id.* ¶ 1.) He identified the overhead lighting circuit, the heater, and an electric blanket as possible causes. (*Id.* ¶ 8-11.) Finally, a third investigator named John Shouman concluded that "[a]t this time it is my opinion that the cause of this fire is undetermined." (Nicoll Decl. (Dkt. # 32) ¶¶ 1, 4.) Like the other investigators, Mr. Shouman concluded that the fire most likely originated in the forward V-berth. (*See id.*) No party has presented any evidence demonstrating that the cause of the fire is known at this time.

Anticipating lawsuits related to the fire, the Bells filed this action for limitation of liability pursuant to the Shipowners' Limitation of Liability Act, 46 U.S.C. § 30505. (*See* Compl.) The Bells ask the court to limit their liability to the value of the SEA FOR TWO, which is zero. (*Id.*)

### III.    ANALYSIS

**A.    Two-Step Analysis Under the Limitation of Liability Act**

Analyzing a petition for limitation of liability is a two-step process. *See In re Anderson*, 847 F. Supp. 2d 1263, 1271 (W.D. Wash. 2012) (citing *In re BOWFIN M/V*, 339 F.3d 1137, 1137 (9th Cir. 2003) (per curiam)). Simply put, the Shipowners' Limitation of Liability Act "limits shipowner liability arising from the unseaworthiness of the shipowner's vessel or the negligence of the vessel's crew unless the condition of

1 unseaworthiness or the act of negligence was within the shipowner's 'privity or

2 knowledge.'"  *Id.*  Thus, the court must first determine whether liability even exists by

3 pinpointing what acts of negligence or conditions of unseaworthiness caused the accident.

4 *Id.* (citing *Hercules Carriers, Inc. v. Claimant State of Fla., Dept. of Transp.*, 768 F.2d

5 1558, 1563-64 (11th Cir. 1985)).  At this first stage, the claimant bears the burden of

6 establishing that a negligent act or unseaworthy condition was the "causative agent" of

7 the alleged harm.  *Id.* at 1271-72 (citing *Carr v. PMS Fishing Corp.*, 191 F.3d 1, 4 (1st

8 Cir. 1999)).  If the claimant meets this burden, the burden shifts to the shipowner to

9 demonstrate a lack of knowledge or privity of the acts of negligence or conditions of

10 unseaworthiness that caused the accident.  *Id.* (citing *Hercules*, 768 F.2d at 1564; *Carr*,

11 191 F.3d at 4).  Here, the Bells have moved for summary judgment, asking the court to

12 declare that, as a matter of law, they are entitled to a limitation of liability.

13 **B.      Standard on a Motion for Summary Judgement**

14       Summary judgment is appropriate if the evidence, when viewed in the light most

15 favorable to the non-moving party, demonstrates "that there is no genuine dispute as to

16 any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

17 P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*,

18 477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing

19 there is no genuine issue of material fact and that he or she is entitled to prevail as a

20 matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party meets his or her burden, the

21 non-moving party "must make a showing sufficient to establish a genuine dispute of

22 material fact regarding the existence of the essential elements of his case that he must

1  prove at trial." *Galen*, 477 F.3d at 658.  The court is "required to view the facts and draw

2  reasonable inferences in the light most favorable to the [non-moving] party." *Scott v.*

3  *Harris*, 550 U.S. 372, 378 (2007).

4  **C.    Step One:  Liability**

5      Claimants attempt to meet their burden of proof at step one by demonstrating that

6  (1) the fire was caused by the Bells' negligent acts and/or (2) the fire was caused by the

7  unseaworthy condition of the SEA FOR TWO.  The court examines each assertion in

8  turn.

9      1.  Liability for Negligence

10     Despite their best efforts, Claimants are unable to demonstrate that any negligent

11  acts by the Bells caused the fire on the SEA FOR TWO.  Thus, they fail to meet their

12  burden of proof[7] at step one with respect to negligence.  *See Carr*, 191 F.3d at 4.

13     Claimants assert several alternative negligence theories, one for each possible

14  cause of the fire.  (*See* Port MSJ; Ace Resp.)  First, Claimants assert that if the cause of

15  the fire was the wiring of the overhead lighting in the V-berth, the Bells were negligent

16  because they hired questionable contractors to do the wiring.  (Ace Resp. at 9.)  Second,

17  they assert that if the cause of the fire was the heater in the V-berth, the Bells were

18  negligent because either they caused combustibles to fall onto the heater, or because they

19  did a faulty job of installing the wiring for the heater.  (*Id.* at 7-8.)

20  _____

21      [7] On summary judgment, the initial burden is on the moving party.  However, since
Claimants have the burden of proof in the underlying action at this step, the Bells can show that
22  there are no genuine issues of material fact simply by showing there is no evidence to support a
negligence claim.  *See Celotex*, 477 U.S. at 325.

The first of these theories does not pass muster.  The theory is based on the fact that, in 2001, the Bells hired several "senior Bayliner factory employees" to remodel the inside of the SEA FOR TWO, including installing new overhead lighting in the V-berth. (*See* Ace Resp. at 9; Bell Decl. ¶ 4; 2d Nicoll Decl. (Dkt. # 42-2) Ex. 2.)  Claimants argue that the Bells were negligent in allowing these Bayliner employees to install the wiring of their overhead lighting because the Bayliner employees were "moonlighting" from their ordinary jobs and because Mr. Bell does not remember if they were certified electricians or not.  (*See* Ace Resp. at 9.)

On the record currently before the court, there is nowhere close to enough evidence for a reasonable jury to find that the Bells were negligent under this theory.  *See Galen*, 477 F.3d at 658.  Claimants' entire negligence case under this theory is based on speculation.  Claimants have seized on the fact that the Bayliner employees were "moonlighting" from their ordinary jobs, but Claimants provide no evidence whatsoever that the employees were unqualified to install the wiring, let alone that they actually performed the wiring in a faulty manner, let alone that this allegedly faulty wiring (done more than ten years ago) caused the fire.  (*See* Ace Resp. at 9.)  Any conclusion to that effect would require speculating about the Bayliner employees' qualifications and about the type of work they performed, since Claimants have presented no evidence about either of those things.  (*See id.*)  Speculation alone is not enough to defeat summary judgment.  *See Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996).  A jury is not permitted to resort to speculation in reaching its verdict at trial, and neither is the court on a summary judgment motion.  *McSherry v. City of Long Beach*,

1  584 F.3d 1129, 1136, 1138 (9th Cir. 2009).  Nor is it helpful to Claimants that Mr. Bell

2  cannot remember whether the Bayliner employees that performed the wiring were

3  certified electricians.  (*See* Ace Resp. ("[The Bells] do not know the employees' names,[8]

4  and do not know whether they were even electricians.").)  To approach a workable

5  negligence theory, Claimants would need to come forth with some evidence that the

6  Bayliner employees were in fact unqualified or performed faulty wiring.  They have not

7  done so here.  (*See* Ace Resp. at 9.)

8      The record contains only evidence to the contrary.  The only non-speculative

9  evidence on this topic suggests that the employees who installed the lighting were, in

10  fact, qualified.  To begin, the senior Bayliner factory employees were installing Bayliner-

11  brand overhead lights on a Bayliner boat—the same brand of boats they designed and

12  built at their jobs with Bayliner.  (Bell Decl. ¶ 4; 2d Nicoll Decl. Ex. 2 at 14.)  The Bells

13  also present evidence that the same Bayliner employees had previously performed

14  satisfactory work on other boats at the Port of Edmonds.  (*Id.*; *id.* Ex. 1 at 5.)  This

15  evidence includes testimony from the owner of the GREAT S'CAPE indicating that he

16  used the same Bayliner employees for other work and that they were "very

17  knowledgeable."  (*Id.* Ex. 1 at 5.)  Moreover, there had been no indication prior to the fire

18  that the wiring might be faulty despite its having been installed more than ten years

19  before.  (Bell Decl. ¶ 4.)

20  

21  _____

22  [8] It appears that Claimants are in possession of the Bayliner employees' names at this
point (*see* 2d Nicoll Decl. Ex. 1 at 5), but there is no indication in the record that they deposed
them or otherwise obtained evidence of their qualifications.

Given the evidence before the court, summary judgment is appropriate with respect to this negligence theory. No reasonable jury could find for Claimants on the evidence now before the court, even construing the evidence in the light most favorable to Claimants. *See Scott*, 550 U.S. at 378. The connection between Claimants' evidence and a valid negligence claim is far too attenuated to defeat summary judgment.

As a result, Claimants' other alternative negligence theories fail as well. As part of the step-one burden in a limitation of liability action, a claimant must show that any negligent acts were the "causative agent" of the eventual harm. *Carr*, 191 F.3d at 4. This is problematic here because every expert in the case has concluded that the cause of the fire cannot be determined. (2d Way Decl. ¶ 5; Farnam Decl. Ex. A ¶ 12; Nicoll Decl. ¶¶ 1, 4.) In light of this problem (and the attendant inference that no reasonable jury could make a specific finding of causation), Claimants proceed under the theory that the Bells may nevertheless be held liable because each of the different possible causes can be attributed to the Bells' negligence. (*See* Ace Resp. at 7-11.) Indeed, where the cause of an accident cannot be determined, a negligence plaintiff may instead show that all possible causes are attributable to the defendant's negligence. *See, e.g.*, *Glover v. BIC Corp.*, 987 F.2d 1410, 1418-20 & n.2 (reversing trial court for failure to give similar instruction); *Loura v. Adler*, 664 N.E.2d 1002, 1004 (where there is a multiplicity of possible causes, some attributable to the defendant's negligence and others not, a plaintiff who cannot produce positive evidence of causation can instead negate all possible causes not attributable to negligence). However, as discussed above, one of the likely causes in this case cannot (on the record before the court) be attributed to negligence. Specifically,

there is insufficient evidence that a negligent act by the Bells caused any alleged faulty wiring of the V-berth lighting.  In light of this, Claimants' one potential path forward[9] is no longer viable.  Accordingly, Claimants' theory does not allow them to proceed, and the Bells have demonstrated that they are entitled to judgment as a matter of law on this issue.  *Carr*, 191 F.3d at 4.

Separately, Plaintiffs assert a theory of negligence that rests on the fact that the Bells did not install smoke detectors on the SEA FOR TWO.  The court discusses this claim separately below because, analytically, it is different from the rest of Claimants' negligence theories.

### 2. Liability for Unseaworthiness

Next, Claimants argue that they have met their step-one burden by demonstrating that an unseaworthy condition caused the fire on the SEA FOR TWO.  Their argument is based on the premise that a vessel that bursts into flames is unseaworthy as a matter of law.  (Port MSJ at 9-12.)  This theory raises a handful of difficult issues.  For simplicity,

---

[9] Claimants briefly discuss a theory of *res ipsa loquitur*, but that theory does not apply.  (*See* Ace Resp. at 11 ("[S]ince Petitioners raise the doctrine of res ipsa in their motion, it bears mentioning here.").)  To proceed on a theory of *res ipsa loquitur*, the claimant must demonstrate "(1) an injury-producing event of a kind that ordinarily does not occur in the absence of someone's negligence; (2) the event must be caused by an agency or instrumentality within the exclusive control of the defendant; and (3) the event must not have been due to any voluntary action or contribution on the part of the plaintiff."  *Ashland v. Ling-Temco-Vought, Inc.*, 711 F.2d 1431, 1437 (9th Cir. 1983).  Claimants have failed to show that a fire on a boat is the kind of accident that ordinarily does not occur in the absence of negligence.

the court will not address these issues because the case can be resolved by assuming

unseaworthiness and proceeding to step two of the limitation of liability analysis.[10]

**D.    Step Two:  Knowledge or Privity**

At step two, the burden shifts to the shipowner to demonstrate a lack of knowledge

or privity[11] of the acts of negligence or conditions of unseaworthiness that caused the

accident.  *Anderson*, 847 F. Supp. 2d at 1271-72.  "'This burden is not met by simply

proving a lack of actual knowledge, for privity and knowledge is established where the

means of obtaining knowledge exist, or where reasonable inspection would have led to

the requisite knowledge.'"  *Id.* at 1271 (quoting *Hercules*, 768 F.2d at 1564).

The Bells have met this standard.  As the Port points out, there are three plausible

causes of the fire:  an electrical flaw in the heater, combustibles placed near the heater,

and the wiring of the overhead lighting.  (Port MSJ at 14-15.)  The Port effectively

concedes that the Bells can meet their burden with respect to the first two of these causes

and disputes only the third.  (*Id.* at 15 ("Two down in the Bell's [sic] favor and one to

go.").)

The court finds that the Bells have met their summary judgment and step-two

burdens with respect to all three possible causes.  The Bells have presented ample

evidence that they had no actual or constructive knowledge of any unseaworthy

_____

[10] Because the SEA FOR TWO has no value at present, limitation under step two has the
same legal effect as exoneration under step one.  If the parties disagree with this, they should
notify the court.

[11] Privity is not an issue in this case and neither party asserts it as an issue.  The step-two
inquiry in this case relates exclusively to the Bells' knowledge of fire-causing defects.

conditions on the SEA FOR TWO.  The Bells present evidence that they took care of their boat with "meticulous attention to detail," and made regular visits to the boat to inspect and maintain it.  (Bell Decl. ¶ 2; *see also* Montgomery Decl. (Dkt. # 30) ¶ 12-13.) Mr. Bell took "took vessel maintenance seriously, and followed the advice and recommendations of hired service professionals." (Montgomery Decl. ¶ 12.)  When service was needed, the Bells scheduled it.  (*See, e.g.*, Bell Decl. ¶ 5 (noting that Mr. Bell scheduled service for his generator the day before the accident immediately after learning that it "did not sound right").)  Mr. Bell is an experienced boat owner who owned and operated vessels for over 50 years and is a former Commodore of the Edmonds Yacht Club.  (*Id.*)  The Bells were "conscientious vessel owners who exercised great care to make sure the [SEA FOR TWO] was in top condition, clean, safe and comfortable . . . [they] were proud of [their] boat."  (Bell Decl. ¶ 8.)  The Bells present evidence that they "displayed a very high degree of pride in ownership, showing a deep commitment to intrinsic vessel recreational, character, and aesthetic values.  The vessel was central to their married and social life . . . ."  (Montgomery Decl. ¶ 13.)

The Bells regularly had the SEA FOR TWO inspected for seaworthiness and to determine if there were any hazards, deficiencies, or deteriorations.  (Montgomery Decl. ¶¶ 10-11.)  The most recent such inspection was in 2007.  (*Id.* ¶ 11.)  At the conclusion of that inspection, the inspector concluded that the vessel was in "above-average condition for vessels of similar age and use, and that it would perform its intended services satisfactorily."  (*Id.*)  The report contained only one recommendation on electrical issues, and Mr. Bell followed that recommendation.  (*Id.*)

With respect to the wiring of the overhead lighting, the Bells had no knowledge of any defects. First, the record is clear that they did not have actual knowledge of any problems: as Mr. Bell testified, "Gerri and I were unaware of any problems with the wiring." (Bell Decl. ¶ 6.) Neither of the Bells were present when the wiring was installed. (*Id.* ¶ 4.) Nor is there any evidentiary basis for charging the Bells with constructive knowledge of the alleged wiring defects. The Bells "never had a problem with the lighting in the V berth—the switches always worked and we never noticed, either by smell or by touch, that there was any heating going on behind the ceiling." (*Id.* ¶ 4.) Mr. Bell testifies that he "had no reason to believe that any of the wall switches were faulty." (*Id.* ¶ 6.) Moreover, the Bells took extremely good care of their vessel, as shown by the evidence discussed above. In short, all of the evidence in the record suggests that reasonable inspection would not have led to knowledge of any wiring defects and the Bells did not fail to employ any reasonable means of obtaining knowledge about any problems. *See Anderson*, 847 F. Supp. 2d at 1271.

Claimants have presented virtually nothing to contradict this evidence. Claimants' only argument against summary judgment relates to the wiring of the overhead lighting. The Port argues that the Bells must be charged with constructive knowledge of any wiring flaws because they were negligent in hiring unqualified, "moonlighting" workers to perform the wiring. (Port MSJ at 15-16.) But the court has already rejected this "moonlighting" theory because it requires far more speculation than the court is permitted to indulge at the summary judgment stage. *See Nelson*, 83 F.3d at 1081-82; *McSherry*,

584 F.3d at 1136, 1138.  The same theory fails for the same reasons in this context:  it is not appropriate on summary judgment to charge the Bells with knowledge of an allegedly unseaworthy condition under a theory grounded not on facts but on pure speculation.  *See Nelson*, 83 F.3d at 1081-82.

In light of the Bells' evidence and Claimants lack of evidence, the court concludes that no reasonable jury confronted with the evidence now before the court could conclude that the Bells had knowledge (actual or constructive) of any unseaworthy condition of the SEA FOR TWO.  As such, they are entitled to summary judgment with respect to limitation of liability.[12]

## E.    Negligence Claim Based on Failure to Install Smoke Detectors

Last, the court addresses Claimants' theory that the Bells were negligent because they failed to install smoke detectors on the SEA FOR TWO.  As that theory goes, the Bells were negligent because they did not install smoke detectors in their boat, and their negligence resulted in the fire being detected much later than it would have been otherwise, thereby causing damages.  (*See* Ace Resp. at 9-11.)  This theory does not fit into the analytical framework described above because it does not follow the same causal pattern as Claimants' other theories of negligence.

---

[12] Claimants present a cursory argument that the Limitation of Liability Act does not apply here because of the so-called "personal contracts" exception to the Act.  (*See* Port MSJ at 12-13.)  That exception does not apply here because the Bells' alleged liability is not based on contract even if they did agree by contract to keep their vessel seaworthy.  This is not a breach of contract action.

There are genuine issues of material fact with respect to this theory of negligence. There is no question that the SEA FOR TWO did not have smoke detectors. (*See* Bell MSJ at 10 ("There were no smoke detectors on the vessel . . . .").) However, the parties dispute whether it was negligent not to install smoke detectors or, to be more specific, whether a reasonable person would have installed smoke detectors. The Bells present evidence that the Port of Edmonds' rules do not require smoke detectors on vessels like the SEA FOR TWO, nor does any applicable law, rule, or regulation. (Bell Resp. at 28-29; Bell MSJ at 10.) On the other hand, a rule or regulation requiring a specific mode of conduct is not a prerequisite to a claim for negligence, and Claimants present evidence that other people in the marina with similar vessels did install smoke detectors, including the owners of the GREAT S'CAPE. (Ace Resp. at 10-11.) Claimants also present evidence that Mr. Bell claims he would have installed a smoke detector if a surveyor had suggested he do so, and evidence that a surveyor actually did suggest he do so. (*See id.* at 10.) In other words, the evidence on the question of reasonable care is equivocal. It is ordinarily a question for the jury whether a defendant has exercised reasonable care, *see, e.g.*, *Ghotra by Ghotra v. Bandila Shipping, Inc.*, 113 F.3d 1050, 1060 (9th Cir. 1997); *Martinez v. Korea Shipping Corp., Ltd.*, 903 F.2d 606, 610 n.3, 611-12 (9th Cir. 1990), and this case is no exception.

The parties also dispute the question of causation—i.e., whether smoke detectors would have made any difference. The Bells present evidence that the kind of smoke alarms they would have installed would not have been heard by anyone outside the SEA FOR TWO. (*See* Bell Resp. at 28-29.) In this regard, they point out that the GREAT

S'CAPE was equipped with smoke detectors, and nobody heard them prior to the time that the fire was spotted visually from Anthony's restaurant and reported to the authorities. (*Id.*) On the other hand, Claimants present expert testimony that the lack of smoke detectors played a role in the spread of the fire. (Farnam Decl. Ex. A ¶ 5.) Further, they present testimony that there were people sleeping approximately 60 feet away from the fire who could potentially have heard an alarm. (Ace Resp. at 10.) More notably, they present testimony from the Port of Edmonds Operations Supervisor that alarms from boats can be heard "all around the marina" at nighttime, even when installed on the inside of a boat. (Danberg Decl. (Dkt. # 36) ¶ 3.) Again, the evidence on this issue is too equivocal to justify granting summary judgment.

Given these two material factual disputes, summary judgment is inappropriate with respect to Claimants' negligence claim premised on failure to install smoke detectors in the SEA FOR TWO.[13]

## IV.    CONCLUSION

Based on the foregoing, the court GRANTS IN PART and DENIES IN PART the Bells' motion for summary judgment (Dkt. # 28) as described above and DENIES the Port's cross-motion for summary judgment (Dkt. # 34). The only claims remaining in

---

[13] There is also no question that the Bells knew they did not have smoke detectors in the SEA FOR TWO. (*See* Bell MSJ at 10.) Thus, there is no basis for limiting liability under this theory pursuant to step two of the limitation of liability analysis. *See Anderson*, 847 F. Supp. 2d at 1271-72.

this case are a post-fire contractual claim and Claimants' theory of negligence based on failure to install smoke detectors in the SEA FOR TWO.

Dated this 13th day of January, 2014.


_____
JAMES L. ROBART
United States District Judge